CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

JUN 0 5 2008

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP VIRGINIA

CHARLES S. CANNADAY,　　　　　)
　　　　Plaintiff,　　　　　　　　)　　Civil Action No. 2:07cv00053
　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　)　　**MEMORANDUM OPINION**
　　　　　　　　　　　　　　　　)
MICHAEL J. ASTRUE,　　　　　　)
**Commissioner of Social Security,**　)　By: GLEN M. WILLIAMS
　　　　Defendant.　　　　　　　)　SENIOR UNITED STATES DISTRICT JUDGE

In this social security case, I vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further consideration consistent with this Memorandum Opinion.

## I. Background and Standard of Review

The plaintiff, Charles S. Cannaday, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Cannaday's claims for supplemental security income, ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

Case 2:07-cv-00053-GMW-PMS　Document 16　Filed 06/05/08　Page 1 of 51　Pageid#: 57

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Cannaday filed his applications for DIB and SSI[1] on or about January 15, 2004, alleging disability as of June 28, 2002,[2] due to diabetes mellitus, osteoarthritis, disorders of the muscles, ligaments and fascia, sinus and breathing problems, problems involving his back, feet, hands, legs and eyes, as well as other miscellaneous problems. (Record, ("R."), at 322-23, 366-67, 639, 643.) The claims were denied initially and on reconsideration. (R. at 322-30, 639-46.) Cannaday then requested a hearing before an administrative law judge, ("ALJ"). (R.

---

[1]Cannaday filed previous applications for DIB and SSI on July 10, 2000. (R. at 125-27, 240-42.) Both claims were denied initially and on reconsideration. (R. at 90-103, 243-54.) Following a hearing, an administrative law judge denied Cannaday's claims, (R. at 77-86), and the decision was upheld by the Appeals Council, who denied Cannaday's request for review. (R. at 33-35.) It also should be noted that the administrative law judge identified June 14, 2000, as the date Cannaday's applications were filed; however, after a review of the record, the undersigned can find no documentation to support this particular date. Thus, the date will be recited as written on the application.

[2]In Cannaday's applications for DIB and SSI, he originally reported an alleged onset date of January 1, 1999. (R. at 350, 635.) Thereafter, Cannaday amended his applications and reported an alleged onset date of June 27, 2002. (R. at 353, 638.) However, at the December 15, 2005, hearing before the administrative law judge, the alleged onset date was reported as June 28, 2002, one day after the date of the previous unfavorable ruling. (R. at 295-98.)

at 332.) The ALJ held a hearing on December 15, 2005, at which Cannaday testified and was represented by counsel. (R. at 293-321.)

By decision dated March 21, 2006, the ALJ denied Cannaday's claims. (R. at 14-27.) The ALJ found that Cannaday met the insured status requirements of the Act for DIB purposes through June 30, 2006. (R. at 19.) The ALJ determined that Cannaday had not engaged in substantial gainful activity at any time relevant to the decision. (R. at 19.) In addition, the ALJ found that Cannaday suffered from impairments that imposed more than a minimal impact on his functional capabilities and that were "severe" as defined in *Evans v. Heckler*, 734 F.2d 1012 (4th Cir. 1984). (R. at 19.) However, the ALJ determined that Cannaday did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21.) The ALJ found that Cannaday possessed the residual functional capacity to perform a wide range of unskilled work at the sedentary[3] level of exertion. (R. at 22.) The ALJ further found that Cannaday could not climb ladders, ropes or scaffolds, should avoid hazards such as moving machinery and unprotected heights and that he was limited in his ability to reach with his right arm. (R. at 22.) The ALJ also determined that Cannaday was capable of frequently lifting items weighing up to 10 pounds, standing/walking for at least two hours in a typical eight-hour workday and that he was unlimited in his ability to sit. (R. at 22.) Moreover, the ALJ found that Cannaday could occasionally climb ramps and stairs, frequently balance, stoop, kneel, crouch and crawl and that he possessed

---

[3]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2007).

Case 2:07-cv-00053-GMW-PMS   Document 16   Filed 06/05/08   Page 3 of 51   PageID#: 59

no other significant manipulative, visual, communicative or environmental limitations. (R. at 22.) Therefore, based upon the above-mentioned limitations, the ALJ found that Cannaday was not capable of performing his past relevant work as a general contractor and furniture factory worker. (R. at 25.) Also, the ALJ noted that transferability of job skills was not material to the disability determination due to Cannaday's young age. (R. at 25.) Based upon Cannaday's age, education, work experience and residual functional capacity, the ALJ found that there were other jobs existing in significant numbers in the national economy that Cannaday was capable of performing, including an office clerk, an interviewer and a surveillance monitor. (R. at 26.) Thus, the ALJ concluded that Cannaday was not under a disability as defined under the Act, and that he was not entitled to benefits. (R. at 26.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2007).

After the ALJ issued his decision, Cannaday pursued his administrative appeals and sought review of the ALJ's decision by the Appeals Council. (R. at 12-13.) The Appeals Council found no reason under the rules to review the ALJ's decision and denied Cannaday's request for review, (R. at 6-8), thereby making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481 (2007). Thereafter, Cannaday filed this action seeking review of the ALJ's unfavorable decision. The case is currently before this court on Cannaday's motion for summary judgment filed on April 4, 2008, and on the Commissioner's motion for summary judgment filed on May 5, 2008.

Case 2:07-cv-00053-GMW-PMS   Document 16   Filed 06/05/08   Page 4 of 51   Pageid#: 60

## II. Facts

Cannaday was born in December 1963, (R. at 350, 635), which classifies him as a "younger individual" under 20 C.F.R. §§ 404.1563(c), 416.963(c). According to the record, Cannaday completed the eighth grade, (R. at 372), which qualifies as a "limited education" under 20 C.F.R. §§ 404.1564(b)(3), 416.964(b)(3). Cannaday has past relevant work experience as a general contractor and as a furniture factory worker. (R. at 367-68, 374-81.)

At the hearing before the ALJ on December 15, 2005, the ALJ pointed out that, in his prior ruling on the original applications, he placed significant restrictions on Cannaday and determined that Cannaday was limited to a range of sedentary work. (R. at 297.) The ALJ also noted, and Cannaday's counsel agreed, that the onset of disability date had been amended to June 28, 2002. (R. at 298.) Cannaday testified that his condition had worsened since 2002.[4] (R. at 299.) He explained that he had been prescribed eyeglasses, which improved his vision. (R. at 300.) However, Cannaday indicated that, although his vision problems had improved since the last decision, he sometimes experienced vision problems due to his diabetes. (R. at 300.) Cannaday testified that the problems with his feet and legs had worsened. (R. at 300.) In particular, Cannaday stated that he experienced numbness and aching pain in his legs. (R. at 300.) Cannaday remarked that snow/ice caused extra danger due to the problems with his feet. (R. at 300-01.) He later testified that he watched television,

---

[4]It should be noted that throughout the December 15, 2005, hearing transcript, the questions by the ALJ, and answers by Cannaday and the vocational expert, are often noted as "INAUDIBLE." Thus, the summarization of the testimony is somewhat limited, due to the fact that portions of the questions and answers are incomplete.

but that he was unable to sit for extended periods. (R. at 301.) Cannaday explained that he usually sat with his feet propped on the couch, but noted that if he became uncomfortable, he would then sit in a normal upright position and later lie down. (R. at 301.) He further explained that his doctor instructed him to elevate his feet when sitting or when watching television, especially when the ulcers on his feet were flared. (R. at 301-02.)

The ALJ questioned Cannaday regarding Exhibit B-17F,[5] and specifically referred to medical records from Therapy Associates of Martinsville dated January 21, 2004. (R. at 302.) On this particular date, the physical therapist noted that Cannaday "reported that he had slipped at work [when] he grabbed for an object with his right hand[.]" (R. at 618.) The ALJ asked Cannaday what the physical therapist meant when she said "slipped at work[,]" to which Cannaday responded, "I really don't know." (R. at 302.) Cannaday testified that he was not working during that time period and denied any slip at work. (R. at 302-03.) After further questioning, Cannaday indicated that he was either misunderstood or the incident was reported inaccurately by the physical therapist. (R. at 304.)

Cannaday testified that he had ulcers on his feet, and that, in May 2005, he stepped on a nail, which caused a sore that had not healed at the time of the hearing. (R. at 305.) Cannaday stated that he treated the wound with antibiotics. (R. at 305.) The ALJ asked Cannaday if this injury occurred while Cannaday was working, and Cannaday said no. (R. at 305.) The ALJ also asked Cannaday to present his hands

---

[5]Exhibit B-17F includes medical records from Therapy Associates of Martinsville covering the time period from November 28, 2003, to February 2, 2004. (R. at 614-30.)

to counsel so that they could be examined for oil, scratches, cuts or anything else that would indicate recent work activity. (R. at 305.) Cannaday's counsel stated that there was no visual evidence of recent work activity. (R. at 305.)

Cannaday testified that he experienced problems with both shoulders, and that he had trouble using both arms. (R. at 306.) Cannaday acknowledged that he could drive, but indicated that he could not drive for long distances. (R. at 306.) Cannaday testified that he was unable to control his diabetes, but he agreed that it could be controlled if he ate properly, tested his blood sugar and took his insulin shots. (R. at 306.) He further stated that, since being diagnosed with diabetes, he has been forced to consistently take multiple insulin shots and watch his blood sugar level. (R. at 307.)

The ALJ again voiced concern about the physical therapist report that Cannaday slipped while at work in January 2004. (R. at 307.) Cannaday once again denied that he reported a work accident to the physical therapist. (R. at 309.) The ALJ noted that Exhibit B-6F[6] supported Cannaday's contention because, in that particular report, Cannaday reported right shoulder pain, but denied a specific injury to the shoulder. (R. at 309, 481.) Cannaday stated that he had difficulty raising his right arm above his hip, but commented that he was able to keep his hands at table level when sitting. (R. at 312.) He further stated that he kept his legs elevated the majority of the time. (R. at 313.) After a series of inquiries by the ALJ as to whether Cannaday needed a chair to elevate his legs during the hearing, Cannaday stated that

---

[6]Exhibit B-6F includes medical records from Carilion Medical Associates - Martinsville dated July 29, 2002, to March 22, 2004. (R. at 468-507.)

he needed a chair to elevate his legs. (R. at 313.) Cannaday explained that, during a typical day, his condition required left leg elevation throughout the day. (R. at 313.) Cannaday also testified that he suffered from knee problems, grip problems and numbness in his extremities. (R. at 315.) The ALJ stated that Cannaday suffered from significant restrictions when the case was originally decided, and he opined that those restrictions continued. (R. at 316.)

Bonnie Martindale, a vocational expert, also was present and testified at the hearing. (R. at 314, 317-21.) The ALJ asked Martindale if the type of work available would be impacted if an individual was limited to an alternate sit/stand work position and was required to elevate his left leg. (R. at 314.) Martindale explained that, in general, if the leg is elevated and held straight out, it would not be allowed, or accommodated for, in the workplace. (R. at 314.) Due to various inaudible portions noted in the hearing transcript, it is not entirely clear as to the precise questions the ALJ asked the vocational expert; thus, the undersigned will quote the questions and responses as recorded in the hearing transcript. The ALJ asked, "what kind of jobs would someone who's on a (INAUDIBLE) list of (INAUDIBLE) sedentary, be able to do? What kind of jobs are there?" (R. at 317.) Martindale explained, "I can identify those types of jobs, but with the no fine work assistance, this position problem, that a lot of jobs, I would identify would (INAUDIBLE) specifically (INAUDIBLE) although, (INAUDIBLE) which is (INAUDIBLE)." (R. at 317.) The ALJ stated that he would cancel that question, and asked if Martindale disagreed with the testimony of the vocational expert who testified at a hearing relating to Cannaday's first applications for SSI and DIB. (R. at 317.) Martindale testified that she disagreed with the prior vocational expert testimony due to the fact that the fine

-8-

work limitation would impact the jobs she would identify. (R. at 317.) Martindale opined that there were jobs existing in significant numbers that Cannaday was capable of performing, including an office clerk, an interviewer, a hand packager and a surveillance monitor. (R. at 318.)

The ALJ asked Martindale to consider Exhibit B-9F[7] and the limitations noted therein, and to consider whether there would be a significant number of jobs available for an individual with those restrictions.[8] (R. at 318-19.) Martindale testified that, based upon the limitations set forth in Exhibit B-9F, the number of available jobs would be reduced. (R. at 319.) Martindale explained that, in her opinion, such an individual would not be able to perform work as a hand packager, but would retain the ability to work as an office clerk or surveillance monitor. (R. at 320.) However, Martindale explained that the job options would be compromised if Cannaday was required to elevate his leg because this restriction would be significant. (R. at 321.)

In rendering his decision, the ALJ reviewed medical records from Memorial Hospital of Martinsville and Henry County; Dr. Carl H. Bivens, M.D.; Therapy Associates of Martinsville; The Bone & Joint Center; Dr. Donald M. Grayson, M.D.; Eye Physicians & Surgeons of Martinsville; Carilion Medical Associates - Martinsville; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. David Tucker, D.P.M.; Piedmont Foot Center; Dr. Frank M. Johnson, M.D., a state agency

---

[7]Exhibit B-9F is a Residual Functional Capacity Assessment (Physical) form completed by Dr. Frank. M. Johnson, M.D., on November 15, 2004. (R. at 519-25.)

[8]In should be noted that much of this section of the hearing transcript is also incomplete, due to inaudible portions. (R. at 318-21.)

physician; Dr. Shubha A. Chumble, M.D.; Martinsville Neurological Associates; Abingdon Foot & Ankle; Dr. Paul R. Eason, M.D.; Memorial Hospital of Martinsville Emergency Room; Endocrinology Associates, Inc.; and David B. Friel, a medical expert. Additional medical records from Dr. Tucker, Memorial Hospital of Martinsville and Carilion Roanoke Memorial Hospital were submitted to the Appeals Council by Cannaday's counsel.[9]

Cannaday was treated by Dr. David Tucker, D.P.M., of the Piedmont Foot Center, from June 28, 2002, to November 1, 2005. (R. at 516-18, 604-08.) On June 28, 2002, Cannaday presented with a recurrent ulceration on his left great toe, which Dr. Tucker attributed to uncontrolled diabetes. (R. at 518.) Cannaday had a full thickness ulceration of his left foot with purulent exudate. (R. at 518.) Dr. Tucker performed a debridement around the ulceration and prescribed Augmentin. (R. at 518.) Cannaday returned on July 3, 2002, and was diagnosed with a Wagner grade II type diabetic ulcer. (R. at 518.) Dr. Tucker debrided the ulceration, and also advised Cannaday to continue to treat the ulceration with wound wash saline and Neosporin. (R. at 518.) Another debridement was performed on July 19, 2002. (R. at 518.) On August 6, 2002, Dr. Tucker noted that the ulceration had healed nicely. (R. at 518.) Dr. Tucker released Cannaday from his care, but noted that he would try to see Cannaday again in approximately two months. (R. at 518.) Dr. Tucker instructed Cannaday "to try to prevent this from breaking down again." (R. at 518.)

---

[9]Since the Appeals Council considered this evidence in reaching its decision not to grant review, this court also will consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F. 2d 93, 96 (4th Cir. 1991).

Dr. Tucker drafted a letter dated August 6, 2002, regarding Cannaday's condition. (R. at 632.) Dr. Tucker noted that Cannaday suffered from a recurrent diabetic ulcer, secondary to neuropathy, on his left foot. (R. at 632.) Dr. Tucker reported that this condition previously caused Cannaday to stay completely off his feet for a period of six weeks. (R. at 632.) Although the ulceration had healed, Dr. Tucker advised Cannaday that he could only moderately ambulate, and that the condition would be a chronic problem in the future that would require ongoing treatment. (R. at 632.) Cannaday saw Dr. Tucker for a follow-up appointment on April 25, 2003. (R. at 518.) At this visit, a diabetic ulcer on Cannaday's left foot was debrided. (R. at 518.) Cannaday was told to utilize wound wash saline, and he was advised to return in two weeks for an evaluation. (R. at 518.)

On May 3, 2004, Cannaday again presented to Dr. Tucker, more than a year after his previous visit. (R. at 517.) Cannaday reported that, about a week prior to the visit, blisters and ulcerations began to form on his feet. (R. at 517.) Dr. Tucker observed three wounds, one on the plantar medial aspect of the right great toe, a second on the dorsal lateral aspect of the left fifth toe and a third being a "sub 1 lesion" on the left foot. (R. at 517.) The "sub 1 lesion" showed some drainage, which was purulent. (R. at 517.) The wounds were debrided and Cannaday was prescribed Levaquin 500 milligrams to be taken four times per day. (R. at 517.) Cannaday was instructed to soak his feet in warm water and soap, apply Bactroban and dress his feet. (R. at 517.) In addition, Dr. Tucker noted that he "adamantly instructed" Cannaday that he was not to work due to the condition of his feet. (R. at 517.) Dr. Tucker further noted that if Cannaday attempted to work, it would likely lead to a "bad result[.]" (R. at 517.) On May 11, 2004, Cannaday underwent

-11-

debridement of the ulcers on both feet, and was instructed to return in one week for an evaluation. (R. at 516.) Cannaday returned for follow-up appointments on May 18 and May 25, 2004, at which time each diabetic ulcer was debrided and dressed. (R. at 516.) On June 8, 2004, Cannaday's diabetic ulceration on the fifth toe of the left foot remained open and was reported as a Wagner grade II ulcer. (R. at 516.) Dr. Tucker debrided the ulcerations and applied dressings. (R. at 516.) On June 25, 2004, Dr. Tucker reported that the ulceration on the plantar aspect of the right big toe was healed, but noted that the fifth toe of the left foot remained unhealed. (R. at 516.) Debridement was once again performed, and Cannaday was advised to cover the wound with a bandage. (R. at 516.)

On August 17, 2004, Cannaday's ulceration on the fifth toe had healed, and there was no evidence of secondary bacterial infection or drainage. (R. at 608.) Cannaday returned on September 14, 2004, and it was reported that he continued to have a diabetic ulcer on the fifth toe of his left foot. (R. at 608.) The ulceration was debrided and Cannaday was advised to continue cleaning the wound at home. (R. at 608.) On October 4, 2004, the wound was once again debrided, Cannaday was prescribed Cephalexin and was instructed to continue cleansing at home and to apply Silvadene cream and a light gauze dressing. (R. at 608.) On October 26, 2004, Dr. Tucker performed a debridement of the ulceration and noted that the wound remained a Wagner grade II ulcer. (R. at 607.) Shortly thereafter, on November 9, 2004, Dr. Tucker noted that the wound was a Wagner grade I ulcer. (R. at 607.) Dr. Tucker performed a debridement and remarked that the wound should heal up over the next two weeks. (R. at 607.) When Cannaday presented on December 28, 2004, the ulceration on the fifth toe had healed. (R. at 607.) Dr. Tucker noted that Cannaday

-12-

was to monitor his ambulation. (R. at 607.) On February 8, 2005, Dr. Tucker reported that the ulceration on the fifth toe was completely healed. (R. at 607.) However, a pre-ulcerative lesion was observed on Cannaday's left great toe. (R. at 607.) The ulceration was debrided and Cannaday was instructed to return for an evaluation in six weeks. (R. at 607.)

Cannaday presented on April 25, 2005, for treatment of the recurrent ulcer on his left fifth toe and an onychia of the left great nail. (R. at. 607.) Both areas were debrided and Cannaday was given Cephalexin. (R. at 607.) Cannaday was advised to continue with home cleansing and to apply dressings. (R. at 607.) On May 4, 2005, Cannaday presented after getting a nail stuck in his foot the day prior to the visit. (R. at 607.) Cannaday reported that he walked on the foot the entire day the injury occurred. (R. at 607.) Dr. Tucker noted that it was a penetrating wound that probed to the bone. (R. at 607.) The wound was cleaned and debrided. (R. at 607.) Dr. Tucker sent Cannaday to the hospital for a tetanus shot and prescribed Cipro. (R. at 607.) Dr. Tucker also ordered an x-ray to make sure there was no deep damage. (R. at 607.)

On May 9, 2005, Cannaday presented for a follow-up regarding his puncture wound. (R. at 606.) Cannaday's toe ulceration was reported to be mildly erythematous. (R. at 606.) Cannaday was continued on Cipro and instructed to continue proper cleansing and dressing changes. (R. at 606.) On May 16, 2005, Cannaday's ulceration was improved, but some central necrosis was noted. (R. at 606.) Debridement of the ulceration was performed, and Cannaday was advised to continue dressing changes and to stay off his feet. (R. at 606.) Cannaday was

-13-

continued on Cipro and prescribed Bactrim. (R. at 606.) Cannaday also was treated on May 25, 2005, June 14, 2005, July 15, 2005, and August 3, 2005. (R. at 606.) During these visits, Wagner grade II ulcers were observed on the right foot and left fifth toe, and, at each visit, the wounds were debrided. (R. at 606.) On August 23, 2005, Dr. Tucker noted that the ulcer on the fifth left toe was completely healed; thus, he released Cannaday from treatment for six weeks. (R. at 605.) On November 1, 2005, Cannaday presented with two diabetic ulcers. (R. at 605.) Dr. Tucker also indicated that some type of compression lesion had developed. (R. at 605.) The ulcerations were debrided and dressings were applied. (R. at 605.) Cannaday was prescribed Omnicef and advised to return for an evaluation in two weeks. (R. at 605.)

On November 18, 2005, Dr. Tucker completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) form. (R. at 610-11.) Dr. Tucker found that Cannaday possessed an unlimited, or very good, ability to follow work rules, relate to co-workers, deal with the public, use judgment with the public, interact with supervisors and function independently. (R. at 610.) He also determined that Cannaday had a good ability to deal with work stresses and to maintain attention and concentration. (R. at 610.) Dr. Tucker noted that these limitations were supported by medical findings regarding Cannaday's fluctuation in blood sugar. (R. at 610.) Dr. Tucker found that Cannaday had a good ability to understand, remember and carry out detailed and complex job instructions, and that Cannaday was unlimited in his ability to understand, remember and carry out simple job instructions. (R. at 611.) Additionally, Dr. Tucker found that Cannaday was unlimited in his ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations and to demonstrate reliability. (R. at 611.) Dr. Tucker concluded

-14-

that Cannaday was able to manage benefits in his best interests. (R. at 611.)

Dr. Tucker also completed a Medical Assessment Of Ability To Do Work-Related Activities (Physical) form on November 18, 2005. (R. at 612-13.) According to Dr. Tucker, Cannaday retained the ability to occasionally lift and/or carry items weighing up to 20 pounds and frequently lift and/or carry items weighing up to five pounds. (R. at 612.) He also found that Cannaday's ability to stand/walk was affected by his impairments; thus, he determined that Cannaday could stand/walk for a total of four hours in a typical eight-hour workday. (R. at 612.) Moreover, Dr. Tucker found that Cannaday could only stand/walk for a total of 30 minutes without interruption. (R. at 612.) Dr. Tucker noted that these limitations were supported by medical findings that Cannaday suffered from neuropathy. (R. at 612.) Cannaday was found to be unlimited in his ability to sit. (R. at 612.) Dr. Tucker found that Cannaday could only occasionally climb, stoop, kneel, balance, crouch and crawl. (R. at 613.) He also reported that Cannaday was limited in his ability to reach, handle, feel, push/pull and see, but noted no limitations in the ability to hear or speak. (R. at 613.) Dr. Tucker found that Cannaday's impairments caused certain environmental restrictions, and, thus, limited his ability to work around heights, moving machinery, temperature extremes, humidity and vibration. (R. at 613.) However, Dr. Tucker noted no limitations as to Cannaday's ability to work around chemicals, fumes, dust and noise. (R. at 613.)

Cannaday was treated by Dr. Paul R. Eason, M.D., at Carilion Medical Associates - Martinsville from July 29, 2002, to May 6, 2005. (R. at 468-507, 534-61.) On July 29, 2002, Cannaday presented for a diabetic follow-up. (R. at 504.)

Case 2:07-cv-00053-GMW-PMS   Document 16   Filed 06/05/08   Page 15 of 51   Pageid#: 71

Cannaday reported continued problems with neuropathy in his feet, but reported no recent lesions. (R. at 504.) Cannaday also reported that he had difficulty controlling his diabetes. (R. at 504.) Dr. Eason noted that Cannaday complained of fatigue, malaise, anorexia, nausea, stiffness and paresthesias. (R. at 504.) Cannaday denied polydipsia, polyphagia, polyuria and any weight change. (R. at 504.) Dr. Eason reported that Cannaday was in no acute distress, but pharyngeal erythema, rhonchi and wheezing was noted. (R. at 505.) Cannaday's strength and range of motion was normal, and there was no joint enlargement or tenderness. (R. at 505.) According to Dr. Eason's assessment, Cannaday's type 1 diabetes mellitus remained uncontrolled. (R. at 505.) Dr. Eason prescribed Humulin, and he also noted that it would probably be best to refer Cannaday to an endocrinologist for an insulin pump, but Dr. Eason indicated that is was not economically viable for Cannaday at that time. (R. at 505.)

Cannaday presented again on July 30, 2002. (R. at 502.) Cannaday complained of pain in the feet, legs, hands and eyes, and he also complained of headaches. (R. at 502.) Dr. Eason reported that Cannaday felt like he could not work due to neuropathy and vision problems related to diabetes. (R. at 502.) Cannaday complained of blurred vision and eye irritation, as well as joint pain, stiffness, insomnia and paresthesias. (R. at 502.) A physical examination revealed decreased reflexes and a decrease in sensation over the feet. (R. at 502.) Dr. Eason noted that Cannaday was not in acute distress. (R. at 502.) Furthermore, Dr. Eason diagnosed Cannaday with significant diabetic neuropathy, which had worsened. (R. at 502.) Dr. Eason prescribed Elavil and instructed Cannaday to continue his insulin at a higher dosage. (R. at 503.) Dr. Eason indicated that nerve conduction testing would be helpful, and noted that he would recommend a neurologist. (R. at 503.)

-16-

The record also contains a letter to Cannaday dated July 31, 2002, from Dr. Eason. (R. at 631.) In the letter, Dr. Eason noted that Cannaday had suffered from type 1 diabetes mellitus since age 24. (R. at 631.) He explained that Cannaday had developed significant diabetic neuropathy, which caused significant pain and numbness in the feet and hands. (R. at 631.) Dr. Eason opined that, in order to have a complete and thorough disability evaluation, Cannaday would need to be referred to a neurologist to have nerve conduction testing completed, which would assist in the assessment of Cannaday's ability to work. (R. at 631.)

Cannaday was admitted to Memorial Hospital of Martinsville and Henry County on October 18, 2002, and was discharged on October 21, 2002. (R. at 420-441.) On October 18, 2002, Cannaday presented to the emergency room and complained of shortness of breath, chills, fever and a cough. (R. at 420.) A physical examination upon admission indicated a slightly elevated temperature, nasal erythema, marginal skin turgor, minimal tachycardia and audible rhonchi in all fields of the chest with expiratory wheezing. (R. at 420.) Posteroanterior and lateral x-rays of the chest revealed a questionable small nodular density over the anterior right first rib, and an apical lordotic view of the chest was recommended. (R. at 436.) No acute cardiopulmonary disease was noted; however, the x-ray showed probable chronic obstructive pulmonary disease, ("COPD"). (R. at 436.) An electrocardiogram, ("EKG"), also was performed on October 18, 2002, and showed normal sinus rhythm and sinus tachycardia. (R. at 421, 441.)

On October 19, 2002, Cannaday was diagnosed with febrile illness, possible right pneumonia, exacerbation of COPD, hypoxemia and possible pulmonary

-17-

embolism. (R. at 425.) Cannaday's history as an insulin-dependent diabetic was noted, and the medical records indicated that, at the time of admission, the only medication he was prescribed was Humulin. (R. at 425.) The medical records also indicated that Cannaday smoked two packs of cigarettes per day. (R. at 425.) Upon admission to the intensive care unit, Cannaday had a cough that produced phlegm and caused significant chest discomfort. (R. at 426.) He was not very mobile and claimed that his illness had forced him to stay in bed. (R. at 426.) Cannaday complained of worsening shortness of breath, as well as weakness, fever and chills. (R. at 426.) He also reported feelings of nausea and a decreased appetite. (R. at 426.) Cannaday denied significant diarrhea or vomiting, and reported no abdominal pain. (R. at 426.) A physical examination revealed some nasal erythema with purulent discharge, and his neck was supple without any jugular venous distention. (R. at 426.) Cannaday's skin turgor was reported as marginal, but did not appear to be "too poor." (R. at 426.) No thyromegaly or lymphadenopathy was observed in the neck. (R. at 426.) An examination of the chest revealed audible rhonchi in all lung fields, and there was prolongation of the expiratory phase. (R. at 426.) Diminished breath sounds were evident in the lower lungs, but no egophony was noted. (R. at 426.) Cannaday also had minimal wheezing in the upper lung fields. (R. at 426.) Significant tenderness in the right calf was noted. (R. at 426.) Cannaday was alert, oriented and insightful, with no neurological deficits. (R. at 426.)

A vascular duplex scan was taken on October 19, 2002, and no abnormalities were reported. (R. at 424.) On October 20, 2002, a single erect apical lordotic portable view of the chest was taken, and was compared to the October 18, 2002, x-ray. (R. at 436-37.) The x-ray revealed no acute cardiopulmonary disease or pleural

effusion, and showed no change to the heart and mediastinum. (R. at 436-37.) The nodular density appeared less apparent and suggested either a superimposed structure or bony prominence, and a lung nodule was said to be doubtful. (R. at 437.) The surrounding structures were unremarkable. (R. at 437.) The right apical nodular density, which was questioned in the October 18, 2002, x-ray, was less apparent and suggested a benign etiology. (R. at 437.) The remainder of the chest was unchanged. (R. at 437.)

According to the medical records, as of October 21, 2002, Cannaday had improved dramatically, with no wheezing, no hypoxia and minimal coughing. (R. at 421.) Thus, due to Cannaday's significant improvement, Dr. Eason determined that it was reasonable to release Cannaday from the hospital. (R. at 421.) In addition, while hospitalized, Cannaday's diabetes remained within a reasonable range. (R. at 421.) Cannaday was told that his tobacco use was the cause of many of his problems. (R. at 421.) Upon discharge, Cannaday was prescribed Azmacort, albuterol, Humulin, Robitussin A-C and doxycycline. (R. at 421.) Cannaday's final diagnosis was acute bronchitis, acute asthma, type II diabetes mellitus and hypoxia. (R. at 422.) Cannaday was instructed to see Dr. Eason one week after discharge. (R. at 422.)

On October 28, 2002, Cannaday presented to Dr. Eason for a follow-up appointment after his hospitalization. (R. at 501.) Dr. Eason reported that Cannaday had improved and that he had drastically reduced his tobacco use. (R. at 501.) Cannaday denied any chest pain, but a cough was observed. (R. at 501.) Dr. Eason opined that Cannaday's asthma had improved and prescribed Azmacort and albuterol.

-19-

(R. at 501.) Dr. Eason advised Cannaday to stop smoking and instructed him to return if his condition did not improve. (R. at 501.) Cannaday presented to Dr. Eason on January 27, 2003, April 21, 2003, May 5, 2003, and June 9, 2003, with complaints of chest/head congestion, asthma, nasal congestion, sore throat, hoarseness, cough, dyspnea, wheezing, excessive sputum, drainage, impotence and dizziness. (R. at 492-94, 497-500.) During these visits, Dr. Eason noted swollen turbinates, pharyngeal erythema, rhonchi, wheezing and anterior cervical adenopathy. (R. at 492-94, 497-500.) Cannaday was diagnosed with minor acute sinusitis, rhinitis and impotence, and was prescribed Zithromax, Proventil, Viagra, Nasacort, Rhinocort, Decadron and Avelox. (R. at 492-94, 497-500.) Dr. Eason repeatedly advised Cannaday to stop smoking. (R. at 492-94, 497-500.)

Dr. W.D. Prince, III, M.D., treated Cannaday at Carilion Medical Associates on July 16, 2003. (R. at 487.) Cannaday complained of chest congestion, anorexia, fatigue, malaise, blurry vision, nasal congestion, dypspnea, wheezing, coughing, excessive sputum and dizziness. (R. at 487-88.) Upon examination, Dr. Prince noted that Cannaday looked chronically ill, but the examination was otherwise unremarkable. (R. at 488-89.) Dr. Prince reported normal strength and range of motion, as well as no joint enlargement or tenderness. (R. at 489.) Dr. Prince noted that Cannaday had a depressed mood. (R. at 489.) Dr. Prince diagnosed Cannaday with ongoing tobacco abuse, acute bronchitis, orthostatic hypotension, infected pre-tibial skin lesions, and he noted that Cannaday did not appear to take good care of himself. (R. at 490.) Dr. Prince encouraged hospitalization for treatment of bronchitis, hyperglycemia and infected skin lesions; however, Cannaday refused due to financial reasons. (R. at 490.) Cannaday was given samples of Levaquin and

-20-

Rocephin. (R. at 490.) Dr. Prince encouraged Cannaday to increase his hydration and to stop smoking. (R. at 490.)

Dr. Prince ordered a posteroanterior lateral chest x-ray, which was taken on July 16, 2003. (R. at 491.) The x-ray showed hyperexpanded lung fields. (R. at 491.) No focal pulmonary consolidation was identified, and the cardiac silhouette was within normal limits. (R. at 491.) The x-ray reading indicated that the mild hyperexpansion may have been due to a supramaximal inspiratory effort by a relatively young patient. (R. at 491.)

Cannaday presented to Dr. Eason on August 25, 2003, and complained of an infected sore on his left leg, as well as problems with his left foot. (R. at 485.) Dr. Eason noted that Cannaday bumped both shins on a ladder, with the right shin clearing up and the left shin becoming red and inflamed. (R. at 485.) Cannaday was not in acute distress, but Dr. Eason observed skin maceration on the middle toe, with a hard callous on the great toe and cellulitis on the anterior shin. (R. at 486.) Dr. Eason diagnosed Cannaday with minor cellulitis of the lower leg, but noted that Cannaday did not appear to be systemically ill. (R. at 486.) Cannaday was prescribed Augmentin and Bactroban ointment, and was advised to clean the infected areas with soap and water. (R. at 486.) Cannaday returned on September 3, 2003, for a follow-up appointment. (R. at 483.) Dr. Eason remarked that Cannaday's diabetes was relatively controlled and that Cannaday felt better. (R. at 483.) Cannaday's cellulitis was improved with only minimal redness around the ulcerated area. (R. at 484.) Cannaday was instructed to continue with three more days of Augmentin, and also was instructed to use Silvadene cream after cleansing. (R. at 484.)

-21-

Cannaday saw Dr. Eason on October 16, 2003, due to right shoulder pain. (R. at 481.) Cannaday was unable to identify how he injured the shoulder. (R. at 481.) He also reported discomfort around the right elbow. (R. at 481.) Dr. Eason noted that Cannaday's diabetes disorder was "doing really quite well." (R. at 481.) Cannaday complained of joint pain, muscle cramps, stiffness, arthritis, weakness and paresthesias. (R. at 481.) Dr. Eason reported a slightly decreased range of motion in the right shoulder, with tenderness over the right elbow. (R. at 482.) Dr. Eason diagnosed Cannaday with minor shoulder and arm pain. (R. at 482.) He opined that it was primarily a soft tissue injury rather than bony. (R. at 482.) In addition, Dr. Eason indicated that Cannaday had some tendinitis around the elbow. (R. at 482.) Cannaday was prescribed Celebrex and was continued on Decadron. (R. at 482.) Cannaday also presented on October 23, 2003, due to a sinus infection. (R. at 480.) He was diagnosed with sinusitis, which was attributed to his tobacco addiction. (R. at 480.) Cannaday was prescribed Biaxin and Allegra, and was once again encouraged to stop smoking. (R. at 480.)

On October 30, 2003, Cannaday sought treatment due to right shoulder pain. (R. at 477.) Cannaday reported complaints of joint pain, joint swelling, stiffness, arthritis, weakness and paresthesias. (R. at 477.) Dr. Eason noted decreased range of motion in the right extremity, with some tenderness over the anterior shoulder. (R. at 478.) Dr. Eason diagnosed Cannaday with minor shoulder pain, instructed Cannaday to continue Celebrex, ordered an x-ray and referred Cannaday to an orthopedist for further evaluation. (R. at 478.) Dr. Eason suspected possible rotator cuff problems. (R. at 478.) The x-ray of the right shoulder was performed on October 30, 2003. (R. at 479.) The x-ray revealed no evidence of fracture,

-22-

subluxation or significant degenerative change. (R. at 479.) The distal clavicular showed an unusual configuration and could have been related to a prior clavicular fracture. (R. at 479.) No acute abnormality was noted. (R. at 479.)

Cannaday presented for a diabetic follow-up appointment on December 29, 2003. (R. at 474.) Cannaday indicated that he was interested in getting an insulin pump because he had experienced low sugar reactions in the evening and at night. (R. at 474.) At this visit, Cannaday reported no other changes in his condition. (R. at 474.) Cannaday complained of paresthesias, and Dr. Eason observed pharyngeal erythema, rhonchi and decreased sensation of the feet. (R. at 474-75.) Dr. Eason noted that, hopefully, Cannaday's diabetic neuropathy was under better control. (R. at 475.) Cannaday was referred to an endocrinologist in Roanoke, Virginia, for further evaluation and consideration of an insulin pump. (R. at 475.) Cannaday sought treatment on February 24, 2004, for a sore throat and sinus congestion. (R. at 472.) Cannaday was diagnosed with minor acute sinusitis, was prescribed Zithromax and Humulin and was advised to stop smoking. (R. at 473.) Cannaday presented with complaints of congestion again on March 11, 2004. (R. at 470.) He complained of head and chest congestion, drainage and a cough. (R. at 470.) Dr. Eason observed swollen turbinates, pharyngeal erythema, rhonchi, wheezing and anterior cervical adenopathy. (R. at 470-71.) Cannaday was diagnosed with minor acute bronchitis and prescribed Biaxin XL and Humibid. (R. at 471.) Dr. Eason explained that the best thing Cannaday could do for himself would be to quit smoking. (R. at 471.)

On March 22, 2004, Cannaday presented for an office visit with Dr. Eason with

-23-

a chief complaint of head congestion, accompanied by drainage, a sore throat and coughing. (R. at 559.) Cannaday denied fevers, chills and sweats, and complained of nasal congestion, a sore throat and hoarseness. (R. at 559.) He also complained of dyspnea, excessive sputum and wheezing. (R. at 559.) Upon examination, Dr. Eason noted that Cannaday was well nourished, well hydrated and not in acute distress. (R. at 559.) Dr. Eason also noted swollen turbinates, pharyngeal erythema, rhonchi and anterior cervical adenopathy. (R. at 560.) Cannaday was diagnosed with rhinitis and sinusitis. (R. at 560.) Cannaday was prescribed amoxicillin and guaifenesin with codeine. (R. at 560.) Dr. Eason advised Cannaday to stop smoking and instructed him to schedule a follow-up if his condition did not improve. (R. at 560.)

Cannaday also saw Dr. Eason on September 9, 2004, regarding his diabetes and claim for disability. (R. at 556.) Dr. Eason reported that Cannaday was unable to work and needed a form to be completed for disability purposes. (R. at 556.) Dr. Eason further remarked that Cannaday could not work due to neuropathy in his hands and feet, and because of diabetic retinopathy. (R. at 556.) In addition, Dr. Eason noted that Cannaday had undergone laser eye surgery, but that he "still [could not] see at times." (R. at 556.) Cannaday denied chest pain and shortness of breath. (R. at 556.) Cannaday explained that his diabetes caused ulcerations on his feet, and that he received treatment from Dr. Tucker. (R. at 556.) Cannaday denied fatigue or malaise, but complained of joint pain, stiffness, weakness and paresthesias. (R. at 556-57.) Dr. Eason noted that Cannaday was not in acute distress, but noted pharyngeal erythema, rhonchi and wheezing. (R. at 557.) Dr. Eason observed callouses and ulcers on both feet. (R. at 557.) Cannaday showed decreased sensation

-24-

over the feet and hands. (R. at 557.) Dr. Eason concluded that Cannaday not only suffered from diabetic neuropathy, but that he also suffered from diabetic retinopathy. (R. at 557.) Dr. Eason explained that these conditions limited Cannaday's ability to work due to poor vision, ulcerations on the feet and diminished ability to feel with his hands. (R. at 557.) Dr. Eason once again advised Cannaday to cease smoking and to closely monitor his diabetes. (R. at 557.)

Cannaday presented on December 10, 2004, for a follow-up regarding his diabetes mellitus with neuropathy. (R. at 551.) Cannaday continued to complain of numbness and tingling in his hands and feet, and explained that his ability to feel was impaired. (R. at 551.) Dr. Eason noted that Cannaday had informed him that due to an unfavorable disability ruling, he was interested in having some tests administered to provide proof of his problems. (R. at 551.) Cannaday complained of fatigue, malaise, weakness and paresthesias, but denied chest pains, peripheral edema, polydipsia, polyphagia and polyuria. (R. at 551.) Upon examination, Cannaday was not in acute distress, but pharyngeal erythema and rhonchi were noted. (R. at 551-52.) Dr. Eason reported decreased sensation over the feet and hands. (R. at 552.) Once again, Dr. Eason reported that Cannaday suffered from diabetic retinopathy and diabetic neuropathy, and indicated that Cannaday may also suffer from diabetic nephropathy. (R. at 552.) Dr. Eason prescribed Humulin, ordered blood work, referred Cannaday for nerve conduction testing and encouraged Cannaday to quit smoking. (R. at 552.) Cannaday presented for a follow-up on February 23, 2005, regarding his diabetes mellitus with renal manifestations and proteinuria. (R. at 545.) Cannaday also complained of nasal congestion, asthma, sore throat, hoarseness, wheezing, excessive sputum and bronchitis. (R. at 545.) Cannaday denied

-25-

polydipsia, polyphagia and polyuria. (R. at 545.) Dr. Eason reported that Cannaday was in no acute distress, but he observed pharyngeal erythema, swollen turbinates and rhonchi. (R. at 546.) Cannaday was diagnosed with diabetes mellitus type 1, with renal complications, as well as minor, acute bronchitis. (R. at 546.) Dr. Eason prescribed doxycyline hyclate and encouraged Cannaday to stop smoking. (R. at 546.)

Cannaday presented for an office visit on April 29, 2005, with chief complaints of chills and confusion. (R. at 538.) Cannaday reported spells of sweating, weakness and confusion. (R. at 538.) He also reported night sweats, fatigue, malaise, muscle cramps and memory loss. (R. at 538.) Dr. Eason noted pharyngeal erythema, rhonchi and decreased sensation. (R. at 539.) Cannaday reported no depression, anxiety or agitation, and his judgment/insight was intact. (R. at 540.) In addition to the previous diagnoses regarding diabetes, Dr. Eason noted a minor diagnosis of night sweats, malaise and fatigue. (R. at 540.) Cannaday's evening dosage of Humulin was reduced. (R. at 540.) Dr. Eason ordered blood work and a chest x-ray. (R. at 540.)

The posteroanterior lateral chest x-ray was taken on April 29, 2005, and compared to a previous study, which occurred on July 16, 2003. (R. at 541.) Cannaday's heart size and configuration area was within normal limits for his age. (R. at 541.) Furthermore, Cannaday's lungs were clear, and there was no evidence of pleural fluid or pneumothorax. (R. at 541.) No acute abnormality of the bones was evident. (R. at 541.) Cannaday's lung fields were hyperexpanded, which was consistent with the previous diagnosis of COPD. (R. at 541.) Dr. Eason opined that

-26-

the COPD had worsened due to Cannaday's tobacco use. (R. at 540.)

Cannaday saw Dr. Eason on May 4, 2005, due to a right foot puncture. (R. at 535.) Dr. Eason noted that, prior to the office visit, Cannaday had seen Dr. Tucker who dressed the wound and prescribed antibiotics. (R. at 535.) Based upon recent blood work, Dr. Eason noted that Cannaday's diabetes appeared to be stable. (R. at 536.) Dr. Eason gave Cannaday a tetanus booster, and he advised Cannaday to keep his leg elevated and to continue his antibiotics. (R. at 536.) In addition, Dr. Eason ordered a computerized axial tomography, ("CT"), scan of the brain on May 6, 2005. (R. at 534.) The CT scan revealed sinusits, but was negative for acute areas of ischemia or infarction. (R. at 534.)

Cannaday presented to the emergency room at Memorial Hospital of Martinsville and Henry County on May 26, 2005, and June 13, 2005, with complaints related to his diabetes. (R. at 562-600.) On May 26, 2005, an initial assessment form indicated that Cannaday was nervous, weak and shaky upon examination. (R. at 590.) Cannaday underwent an EKG, which yielded normal results. (R. at 584.) A chest x-ray showed the heart size and configuration to be within normal limits for Cannaday's age. (R. at 600.) Cannaday's lungs were clear and there was no evidence of pleural fluid or pneumothorax. (R. at 600.) There was no evidence of acute abnormality of the bones. (R. at 600.) The x-ray showed a stable chest without evidence of acute cardiopulmonary disease. (R. at 600.) The final diagnosis upon discharge was hypoglycemia. (R. at 582.) Renal insufficiency also was noted, and Cannaday was advised to eat regularly when using insulin. (R. at 582.) On June 13, 2005, Cannaday presented to the emergency room after allegedly losing consciousness. (R. at 571.)

An initial assessment form indicated that Cannaday exhibited signs of nervousness, weakness and shakiness, and that he was diaphoretic. (R. at 564.) An EKG revealed borderline findings, as the vertical axis was unusual for Cannaday's age. (R. at 577.) A chest x-ray showed borderline findings in regard to a vague lingular infiltrate adjacent to the left heart border, which may have been caused by vascular crowding or atelectasis. (R. at 580.) Upon discharge, the final diagnosis was hypoglycemia, and Cannaday was once again instructed to always eat regularly when taking insulin. (R. at 563.)

Cannaday was treated at the Bone & Joint Center from November 10, 2003, to February 4, 2004. (R. at 462-66.) On November 10, 2003, Cannaday presented and complained of pain in the right shoulder. (R. at 466.) He explained that he had endured pain and stiffness for quite some time, and that despite the use of conservative care, including steroid injections, the pain had increased. (R. at 466.) Dr. John P. McGee, M.D., noted that Cannaday could not recall an injury that caused the pain. (R. at 466.) Cannaday claimed that his shoulder was stiff and that he had difficulty maneuvering it. (R. at 466.) Upon examination, no point tenderness over the acromioclavicular joint, ("AC"), acromion or clavicle was noted. (R. at 466.) Positive tenderness was observed over the greater tuberosity. (R. at 466.) Dr. McGee noted that Cannaday was only able to flex and abduct to about 70 degrees, and that beyond that point, it felt like there was a mechanical block. (R. at 466.) Dr. McGee stated that rotator cuff testing caused pain, and that Cannaday's cuff strength graded at four out of five. (R. at 466.) Furthermore, x-rays of Cannaday's shoulder showed no acute bony abnormality. (R. at 466.) Dr. McGee determined that Cannaday suffered from adhesive capulitis and ordered a magnetic resonance imaging, ("MRI"),

-28-

scan. (R. at 466.)

On November 18, 2003, Cannaday underwent an MRI of the right upper extremity. (R. at 465.) The MRI showed a slight mottling of the marrow signal of the humeral head; however, this was said to "probably" be within normal limits. (R. at 465.) Minimal cystic degeneration of the superolateral aspect of the humeral head was noted, but the exact etiology or significance of the degeneration was uncertain. (R. at 465.) However, the remainder of the study was relatively unremarkable. (R. at 465.) Mild degenerative arthritis of the AC joint was observed, but there was no significant inferior spurring. (R. at 465.) The rotator cuff mechanism appeared to be intact and the glenoid labra appeared to be normal. (R. at 465.) The MRI revealed a small shoulder joint effusion. (R. at 465.)

Cannaday again presented to the Bone & Joint Center on November 24, 2003, for a follow-up regarding his MRI. (R. at 464.) Cannaday reported no change in his shoulder. (R. at 464.) Dr. McGee's examination revealed no point tenderness over the AC joint, acromion or clavicle. (R. at 464.) Cannaday's flexion and abduction was at 90 degrees and anything beyond 90 degrees resulted in pain. (R. at 464.) Dr. McGee graded Cannaday's rotator cuff strength at four out of five. (R. at 464.) Dr. McGee determined that the MRI was fairly unremarkable, and he opined that he did not see any significant impingement or anything that was surgical. (R. at 464.) Cannaday was once again diagnosed with adhesive capsulitis, and Dr. McGee recommended physical therapy. (R. at 464.) Dr. McGee also noted that he discussed arthroscopy and manipulation under anesthesia; however, Cannaday indicated that he did not want to proceed, which Dr. McGee opined was reasonable. (R. at 464.)

-29-

Cannaday returned for a follow-up on January 14, 2004, and complained of shoulder stiffness. (R. at 463.) Cannaday acknowledged some improvement, but stated that sudden movement caused pain. (R. at 463.) A physical examination showed no changes, other than an increase in Cannaday's flexion and abduction. (R. at 463.) Dr. McGee's assessment was unchanged, and he advised Cannaday to continue physical therapy and to follow up in three weeks. (R. at 463.) Cannaday returned on February 4, 2004, and stated that "overall [his shoulder was] doing all right[.]" (R. at 462.) However, Cannaday reported that he still experienced some pain. (R. at 462.) A physical examination revealed no AC joint, acromion or clavicle tenderness, and also showed an increase in flexion and abduction. (R. at 462.) In addition, Cannaday's cuff strength improved, as it was graded a nearly five out of five. (R. at 462.) Dr. McGee found that Cannaday's adhesive capsulitis was slowly resolving. (R. at 462.) Cannaday was advised to continue home exercises and was permitted to cease formal physical therapy. (R. at 462.) Dr. McGee suggested that Cannaday follow up in six weeks. (R. at 462.)

Cannaday sought treatment from Therapy Associates of Martinsville from November 28, 2003, to February 2, 2004. (R. at 445-61.) On November 28, 2003, Cannaday reported that he experienced pain following the evaluation, and he indicated that his pain was constant and rated as eight on a 10 point scale. (R. at 461.) Linda Delport, a physical therapist, noted that Cannaday's flexion had improved to 120 degrees, his abduction to 80 degrees and his internal rotation to 15 degrees. (R. at 461.) Delport noted that Cannaday continued to experience tightness to the posterior capsule, inferior capsule and structures around the shoulder. (R. at 461.) Following treatment, Cannaday rated his pain as seven on a 10 point scale. (R.

-30-

at 461.) Cannaday was able to put his hand behind his back, approximately four inches above his belt, and he was able to touch his opposite shoulder with his hand. (R. at 461.) Cannaday was instructed to continue physical therapy with aggressive/passive mobilization and functional mobilization of his shoulder. (R. at 461.)

Cannaday returned to Therapy Associates on December 1, 2003, and explained that he did not experience arm pain after his last treatment. (R. at 460.) He further explained that he experienced a decrease in the range of motion in his shoulder, but stated that it was not as tight as it was prior to the first treatment. (R. at 460.) Delport reported an improved range of motion of the shoulder, including a flexion of 130 degrees, abduction of 95 degrees, external rotation of 10 degrees and an internal rotation of 15 degrees. (R. at 460.) After being treated, Cannaday's abduction, external rotation and internal rotation all improved. (R. at 460.) Cannaday also was able to put his hand behind his back, approximately four inches above his belt. (R. at 460.) Cannaday was advised to continue physical therapy with aggressive mobilization of his shoulder. (R. at 460.) Cannaday also presented on December 3, 2003, and reported feeling very stiff in the mornings. (R. at 459.) He also indicated that he was able to work the day prior to the visit, but explained that he was forced to be careful with sudden movements. (R. at 459.) An examination of Cannaday's active range of motion, ("AROM"), of the right shoulder revealed a flexion of 120 degrees, an extension of 15 degrees into hyperextension, an abduction of 95 degrees and a scaption of 135 degrees. (R. at 459.) Delport noted that Cannaday continued to have tightness of his latissimus dorsi, supraspinatus and infraspinatus. (R. at 459.) Following treatment, Cannaday's flexion improved to 135 degrees and his abduction

-31-

improved to 115 degrees. (R. at 459.) In addition, Cannaday stated that he could once again touch his other shoulder posteriorly. (R. at 459.) Cannaday was instructed to continue physical therapy with aggressive mobilization. (R. at 459.)

On December 5, 2003, Cannaday indicated that he continued to experience pain with sudden movements. (R. at 458.) He stated that he was able to put his jacket on, but noted that it caused shoulder pain. (R. at 458.) Delport noted that Cannaday's internal rotation remained restricted; however, after treatment, his internal rotation improved to 45 degrees. (R. at 458.) Delport recommended that Cannaday continue physical therapy with aggressive mobilization of his shoulder into internal rotation and circumduction. (R. at 458.) On December 12, 2003, Delport diagnosed Cannaday with adhesive capsulitis. (R. at 457.) Delport noted that Cannaday had received five treatments, and that Cannaday's range of motion had improved. (R. at 457.) Delport further noted that she had contacted Medicaid in an attempt to gain approval for further treatment. (R. at 457.) Delport opined that Cannaday would benefit from continued physical therapy due to that fact that Cannaday had shown significant improvement in just five treatments. (R. at 457.)

Cannaday presented to Therapy Associates on January 7, 2004, and reported that his arm was once again very tight due to the lapse in treatment while attempting to gain preauthorization of treatment. (R. at 454.) Cannaday claimed that he could not lie on his right shoulder, and he indicated that he could not reach above/behind his back. (R. at 454.) Delport observed restrictions in internal rotation and external rotation. (R. at 454.) She reported that abduction could only be taken to 85 degrees due to severe increase in pain. (R. at 454.) After Delport treated Cannaday,

-32-

Cannaday's internal rotation improved to 25 degrees and his external rotation improved to 18 degrees. (R. at 454.) Delport opined that Cannaday would lose some of the improved motion, and she recommended that Cannaday continue physical therapy with aggressive mobilization of the right shoulder. (R. at 454.) Cannaday again sought treatment on January 8, 2004, and indicated that he experienced significant pain after the January 7, 2004, treatment. (R. at 453.) Cannaday reported that he was able to put his jacket on above his head, but claimed that he could not sleep with his arm above his head and that he was unable to reach out to the back. (R. at 453.) Cannaday's internal and external rotation improved; however, he continued to experience tightness over the pectoral muscles and the inferior capsule of his shoulder. (R. at 453.) Delport noted that Cannaday had muscle guarding of the infraspinatus. (R. at 453.) Delport found that, following treatment, Cannaday demonstrated increased mobility of the shoulder. (R. at 453.) Despite the increased mobility, Cannaday nevertheless reported shoulder pain. (R. at 453.) Delport advised Cannaday to continue physical therapy with aggressive mobilization of the shoulder. (R. at 453.)

On January 12, 2004, Cannaday presented to Therapy Associates and reported that he continued to have problems reaching and putting his hands behind his back. (R. at 452.) Cannaday explained that sudden movements of the shoulder caused sharp pain. (R. at 452.) Cannaday's flexion was 132 degrees, with an external rotation of 52 degrees and an internal rotation of 30 degrees. (R. at 452.) After treatment, Cannaday was able to position his arm behind his back approximately two inches above belt level, and he stated that he could reach under his other arm. (R. at 452.) Delport instructed Cannaday to continue physical therapy with aggressive

-33-

mobilization of the arm, concentrating on internal and external rotation. (R. at 452.) On January 14, 2004, Delport diagnosed Cannaday with right shoulder adhesive capsulitis, and she recommended further therapy. (R. at 451.) During this visit, Cannaday complained of decreased mobility and pain caused by sudden movements. (R. at 451.) Additionally, Cannaday complained of tightness that occurred when his hand was behind his back or when reaching back. (R. at 451.) Delport reported that Cannaday's range of motion improved during treatment, but that he regressed at home. (R. at 451.) Delport opined that, in general, Cannaday had shown improvement. (R. at 451.) Following this particular treatment, Cannaday complained of increased pain, which he said usually lasted until the evening. (R. at 450.) Delport noted that Cannaday demonstrated increased mobility in his shoulder. (R. at 450.) Once again, Delport advised Cannaday to continue physical therapy with aggressive mobilization of the shoulder. (R. at 450.)

On January 19, 2004, Cannaday reported increased mobility in his shoulder and claimed that the pain had decreased. (R. at 449.) Cannaday indicated that he continued to experience difficulties reaching behind his back, but stated that the task had gotten easier. (R. at 449.) After receiving treatment, Cannaday was able "to do abduction right up to his ear." (R. at 449.) Cannaday's internal and external rotation had improved; however, Delport determined that it remained restricted. (R. at 449.) Delport suggested that Cannaday continue physical therapy with aggressive mobilization. (R. at 449.) According to the medical records, on January 21, 2004, Delport noted that Cannaday reported that he had slipped at work when he grabbed for an object with his right hand. (R. at 448.) Cannaday claimed that the sudden movement did not induce as much pain as it had in the past. (R. at 448.) Delport

-34-

reported that Cannaday always displayed increased range of motion following treatment, and she recommended physical therapy with aggressive mobilization of the shoulder, with a concentration on internal and external rotation. (R. at 448.) On January 23, 2004, Cannaday stated that he felt much looser, but indicated that he continued to have problems reaching behind his back. (R. at 447.) A range of motion examination showed an improvement as to external and internal rotation, as well as scaption improvement. (R. 447.) After treatment, Cannaday's flexion improved to 175 degrees and he was able to perform abduction "to against his ear." (R. at 447.) Delport opined that Cannaday would regress some, and she advised him to continue physical therapy with aggressive mobilization, as tolerated. (R. at 447.)

Cannaday sought treatment on January 29, 2004, and stated that he experienced problems stretching his arm at home, and noted that he was able to stretch better at therapy. (R. at 446.) Cannaday tolerated treatment, but noted some increase in pain. (R. at 446.) Despite the pain, Cannaday's range of motion increased, and he was instructed to continue physical therapy. (R. at 446.) On February 2, 2004, Cannaday reported that he no longer experienced sharp pains. (R. at 445.) He noted that his shoulder became stiff in the absence of regular exercise. (R. at 445.) Following treatment, Cannaday's flexion was 150 degrees, his abduction was 145 degrees, his external rotation was 62 degrees and his internal rotation was 82 degrees. (R. at 445.) Cannaday complained of increased pain after the treatment, and indicated that the pain normally eased after approximately two to three hours. (R. at 445.)

On January 6, 2004, Cannaday sought treatment from Dr. Carl H. Bivens,

-35-

M.D., of Endocrinology Associates, Inc.[10] (R. at 442-44.) Cannaday presented with a chief complaint of diabetes. (R. at 442.) Dr. Bivens noted that Cannaday took neutral protamine hagedorn, ("NPH"), twice a day to treat his diabetes. (R. at 442.) Cannaday reported nocturia, but no polyuria or polydipsia. (R. at 442.) Cannaday also reported several insulin reactions, which he said normally occurred between approximately 2:00 a.m. and 7:00 a.m. (R. at 442.) Cannaday indicated that he experienced occasional blurriness, but that his vision was okay. (R. at 442.) An ulcer was observed on Cannaday's left foot. (R. at 442.) Cannaday reported sexual problems, but not complete erectile dysfunction. (R. at 442.) He also complained of shortness of breath and acknowledged that he smoked. (R. at 442.) Cannaday complained of chest pain, and he also reported gas, heartburn, arthalgias and a "frozen shoulder[,]" which he treated with Celebrex. (R. at 442.) Cannaday also indicated that he performed yard work at home. (R. at 442.)

Upon examination, Dr. Bivens found that Cannaday was well developed, well nourished, alert, oriented and that he appeared to be in no acute distress. (R. at 442.) The examination was otherwise unremarkable. (R. at 442.) Cannaday was diagnosed with diabetes mellitus type I, with inadequate control, and frozen shoulder. (R. at 442.) Dr. Bivens also noted suspected diabetic nephropathy. (R. at 442.) Dr. Bivens opined that Cannaday needed an ace inhibitor for his proteinuria, and he prescribed Accupril. (R. at 443.) Dr. Bivens explained that Cannaday's diabetic regimen needed to be intensified with diet, exercise and home glucose monitoring, in addition to his

[10]It should be noted that Cannaday also was treated at Abingdon Foot & Ankle from February 25, 2004, to January 3, 2005. However, the medical records are largely illegible. (R. at 529-33.)

Case 2:07-cv-00053-GMW-PMS Document 16 Filed 06/05/08 Page 36 of 51 Pageid#: 92

normal insulin regimen. (R. at 443.) Cannaday's evening NPH dosage was reduced due to nocturnal hypoglycemia. (R. at 443.) Dr. Biven discussed the possibility of an insulin pump, and advised Cannaday to return in six weeks. (R. at 443.)

Cannaday also saw Dr. Bivens on July 25, 2005, and August 4, 2005. (R. at 601-03.) Cannaday informed Dr. Bivens that "[e]verything seem[ed] to be OK[.]" (R. at 602.) Cannaday noted that he had ulcers on his feet that had nearly healed. (R. at 602.) Cannaday reported that he experienced spells that caused him to be a little shaky. (R. at 602.) Upon examination, Dr. Bivens observed callouses on the left foot, but no real ulcers. (R. at 602.) Cannaday was diagnosed with type 1 diabetes with questionable control. (R. at 602.) Dr. Bivens gave Cannaday a One Touch Ultra glucometer for glucose testing, and also noted that, hopefully, Cannaday could get glucose test strips through Medicaid or a free clinic, due to his financial problems. (R. at 602.) Dr. Bivens indicated that he may want to empirically increase the insulin dosage if Cannaday's glycated hemoglobin test was high. (R. at 602.) Cannaday was instructed to return in three months. (R. at 602.) Cannaday returned on August 4, 2005, and tests results showed that Cannaday's blood sugar was not being adequately controlled. (R. at 601.)

Dr. Donald M. Grayson, M.D., sent a letter to Disability Determination Services dated March 10, 2004. (R. at 467.) Dr. Grayson indicated that he treated Cannaday on February 25, 2004, and that Cannaday's visual acuity in the right eye was 20/20 to 20/25. (R. at 467.) Dr. Grayson further indicated that the vision in Cannaday's left eye was corrected to 20/20. (R. at 467.) Dr. Grayson noted that Cannaday suffered from diabetic retinopathy, and that Cannaday had undergone laser

Case 2:07-cv-00053-GMW-PMS    Document 16    Filed 06/05/08    Page 37 of 51    PageID#: 93

treatment for macular edema in both eyes. (R. at 467.)

On March 26, 2004, Dr. Richard M. Surrusco, a state agency physician, completed a Physical Residual Functional Capacity Assessment, ("PRFC"). (R. at 508-15.) Dr. Surrusco determined that Cannaday could occasionally lift and/or carry items weighing up to 20 pounds, and frequently lift and/or carry items weighing up to 10 pounds. (R. at 509.) Dr. Surrusco also found that Cannaday was able to sit and stand and/or walk for a total of about six hours in a typical eight-hour workday. (R. at 509.) Dr. Surrusco determined that Cannaday was limited in his ability to push and/or pull with his upper extremities. (R. at 509.) Furthermore, Dr. Surrusco found that Cannaday was limited in his ability to reach in all directions with his right extremity, including overhead. (R. at 511.) However, Cannaday was found to be unlimited in his ability to handle, finger and feel. (R. at 511.) No postural, visual, communicative or environmental limitations were noted. (R. at 513.)

On November 15, 2004, Dr. Frank M. Johnson, M.D., performed a PRFC on Cannaday. (R. at 519-25.) Dr. Johnson found that Cannaday was capable of occasionally lifting and/or carrying items weighing up to 20 pounds, and that he could frequently lift and/or carry items weighing up to 10 pounds. (R. at 520.) Dr. Johnson also determined that Cannaday was capable of standing and/or walking for a total of slightly less than four hours in a typical eight-hour workday. (R. at 520.) Dr. Johnson found that Cannaday could sit for a total of about six hours in a typical eight-hour workday. (R. at 520.) Moreover, Dr. Johnson opined that Cannaday was limited in his ability to push and/or pull with his upper extremities. (R. at 520.) Dr. Johnson found that Cannaday could frequently balance, stoop, kneel, crouch and

-38-

crawl, but that he could only occasionally climb. (R. at 521.) He also determined that Cannaday was limited in his ability to reach in all directions with his right extremity, including overhead. (R. at 521.) However, Dr. Johnson found that Cannaday was unlimited in his ability to handle, finger and feel. (R. at 521.) No visual, communicative or environmental limitations were noted. (R. at 522.) Lastly, based upon his review of the evidence, Dr. Johnson found that Cannaday's allegations were only partially credible. (R. at 524.)

On December 14, 2004, Cannaday was treated by Dr. Shubha A. Chumble, M.D., at Martinsville Neurological Associates. (R. at 526-28.) Cannaday presented for a nerve conduction study of the upper and lower extremities. (R. at 526.) A brief neurological examination suggested soft signs of peripheral neuropathy in the lower extremities, and Tinel's and Phalen's sign at the wrist and elbow were negative. (R. at 526.) The study was indicative of peripheral neuropathy affecting the upper and lower extremities with axonal and demyelinating features consistent with diabetes. (R. at 526.) Additionally, left carpal tunnel syndrome of questionable significance was identified. (R. at 526.)

On December 6, 2005, David B. Friel, a medical expert, completed a Medical Assessment Of Ability To Do Work-Related Activities (Physical) form. (R. at 633-34.) Friel opined that Cannaday's ability to lift/carry was affected by his impairment. (R. at 633.) It appears that Friel found that Cannaday's ability lift and/or carry items was affected by his impairments.[11] (R. at 633.) In addition, he found that Cannaday's

_____

[11]The report completed by David B. Friel is partially illegible and difficult to decipher. Friel noted that Cannaday's was limited in his ability to lift and/or carry; however, he did not

Case 2:07-cv-00053-GMW-PMS Document 16 Filed 06/05/08 Page 39 of 51 Pageid#: 95

abilities to stand/walk and sit were affected by his impairment. (R. at 633.) Friel determined that Cannaday could stand/walk or sit for zero hours in a typical eight-hour workday. (R. at 633.) In regards to postural activities, physical functions and environmental restrictions, Friel determined that these activities were not applicable. (R. at 634.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2007).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age,

---

identify how much Cannaday could lift and/or carry. (R. at 633-34.)

-40-

education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated March 21, 2006, the ALJ denied Cannaday's claims. (R. at 14-27.) The ALJ found that Cannaday met the insured status requirements of the Act for DIB purposes through June 30, 2006. (R. at 19.) The ALJ determined that Cannaday had not engaged in substantial gainful activity at any time relevant to his decision. (R. at 19.) In addition, the ALJ found that Cannaday suffered from impairments that imposed more than a minimal impact on his functional capabilities and that were "severe" as defined in *Evans v. Heckler*, 734 F.2d 1012 (4th Cir. 1984). (R. at 19.) However, the ALJ determined that Cannaday did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21.) The ALJ found that Cannaday possessed the residual functional capacity to perform a wide range of unskilled work at the sedentary level of exertion. (R. at 22.) The ALJ further found that Cannaday could not climb ladders, ropes or scaffolds, should avoid hazards such as moving machinery and unprotected heights and that he was limited in his ability to reach with the right arm. (R. at 22.) The ALJ also determined that Cannaday was capable of frequently lifting items weighing up to 10 pounds, standing/walking for at least two hours in a typical eight-hour workday and that he was unlimited in his ability to sit. (R. at 22.) Moreover, the ALJ found that Cannaday could occasionally climb ramps and stairs, frequently balance, stoop, kneel, crouch and crawl and that he possessed no other significant manipulative, visual, communicative or environmental

-41-

limitations. (R. at 22.) Therefore, based upon the above-mentioned limitations, the ALJ found that Cannaday was not capable of performing his past relevant work as a general contractor and furniture factory worker. (R. at 25.) Also, the ALJ noted that transferability of job skills was not material to the disability determination due to Cannaday's young age. (R. at 25.) Based upon Cannaday's age, education, work experience and residual functional capacity, the ALJ found that there were other jobs existing in significant numbers in the national economy that Cannaday was capable of performing, including an office clerk, an interviewer and a surveillance monitor. (R. at 26.) Thus, the ALJ concluded that Cannaday was not under a disability as defined under the Act, and that he was not entitled to benefits. (R. at 26.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2007).

Cannaday argues that the ALJ's decision is not supported by substantial evidence. (Plaintiff's Brief in Support of Motion for Summary Judgment, ("Plaintiff's Brief"), at 11-16.) Specifically, Cannaday contends that the ALJ's residual functional capacity finding is not supported by substantial evidence within the record. (Plaintiff's Brief at 11-15.) Cannaday also argues that the Commissioner failed to establish that there is other work in the national economy that Cannaday is capable of performing. (Plaintiff's Brief at 15-16.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial

-42-

evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997)

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Cannaday first argues that the ALJ's residual functional capacity determination is not supported by substantial evidence. (Plaintiff's Brief at 11-15.) Cannaday points out that the ALJ determined that diabetic neuropathy constituted a severe impairment. (Plaintiff's Brief at 12.) However, despite finding that diabetic neuropathy was a severe impairment, Cannaday contends that the ALJ failed to include the limitations associated with the impairment in his residual functional capacity determination. (R. at 12-15.) After a thorough review of the evidence before the court, I concur.

According to the ALJ, Cannaday suffered from multiple "severe" impairments,

-43-

including diabetic neuropathy. (R. at 20.) In general, a severe impairment is defined as any impairment or combination of impairments which significantly limits the claimant's physical or mental ability to do basic work activities. *See Luckey v. U.S. Dept. of Health & Human Servs.*, 890 F.3d 666, 669 (4th Cir. 1989) (per curiam); 20 C.F.R. §§ 404.1520(c), 416.920(c) (2007). Diabetic neuropathy is defined as a chronic, symmetrical sensory involving several nerves that first affects the nerves of the lower limbs and often affects autonomic nerves. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 1131 (27th ed. 1988). Diabetic neuropathy is a nerve disorder caused by diabetes that can lead to pain, tingling and numbness to the hands, arms, feet and legs, and it is more common in individuals who have difficulties controlling their diabetes. National Institute of Diabetes and Digestive and Kidney Diseases, http://www.niddk.nih.gov/dm/pubs/neuropathies/index.htm#what (last visited May 30, 2008). The most common type of diabetic neuropathy is peripheral neuropathy, which causes pain and loss of feeling in the toes, feet, legs, hands and arms. National Institute of Diabetes and Digestive and Kidney Diseases, http://www.niddk.nih.gov/dm/pubs/neuropathies/index.htm#peripheralneuropathy (last visited May 30, 2008).

The medical records clearly demonstrate that Cannaday has been consistently treated for uncontrolled diabetes mellitus. During the course of that treatment, various medical professionals have either diagnosed Cannaday with, or made reference to, diabetic neuropathy. On July 30, 2002, Dr. Eason diagnosed Cannaday with significant diabetic neuropathy. (R. at 502.) Because Cannaday had experienced a decrease in sensation of the extremities, as well as pain and numbness in the feet and hands, Dr. Eason recommended that Cannaday undergo a nerve

-44-

conduction study. (R. at 502-03.) This medical opinion was reiterated by Dr. Eason in a letter dated July 31, 2002. (R. at 631.) Subsequent to Dr. Eason's diagnosis and opinion, he continued to treat Cannaday, and, during that time period, Dr. Eason repeatedly reported a decrease in sensation over the hands and feet. (R. at 474-75, 539, 552, 557.) On September 20, 2004, Dr. Eason noted that Cannaday's neuropathy limited his ability to work, due to a diminished ability to feel with his hands. (R. at 557.)

A nerve conduction study by Dr. Chumble revealed signs of peripheral neuropathy in the lower extremities, and also was indicative of peripheral neuropathy that affected both the upper and lower extremities. (R. 526.) Furthermore, Dr. Tucker, a podiatrist who routinely treated Cannaday for foot ulcerations during the relevant time period, opined that Cannaday's diabetic ulcerations were directly related to neuropathy. (R. at 632.) On November 18, 2005, Dr. Tucker also concluded that Cannaday's abilities to feel, push/pull, reach, handle and see were all limited due to diabetic neuropathy and peripheral neuropathy. (R. at 613.) Likewise, Dr. Bivens, an endocrinologist, examined Cannaday and diagnosed him with diabetes mellitus type 1, with inadequate control, and also noted that diabetic neuropathy was suspected. (R. at 442.)

The ALJ found that Cannaday retained the residual functional capacity to perform a wide range of unskilled sedentary work. (R. at 22.) In particular, the ALJ determined that Cannaday could not climb ladders, ropes or scaffolds, and that Cannaday should avoid hazards such as working at unprotected heights and around moving machinery. (R. at 22.) The ALJ also found that Cannaday was limited in his

ability to reach with his right arm; that he could only occasionally climb ramps and stairs; that he could frequently balance, stoop, kneel, crouch and crawl; that he was capable of frequently lifting items weighing up to 10 pounds; that he could stand/walk for at least two hours in a typical eight-hour workday; and that he was unlimited in his ability to sit. (R. at 22.) The ALJ also concluded that Cannaday had no other significant manipulative, visual, communicative or environmental limitations. (R. at 22.)

The ALJ's residual functional capacity lacks any limitations with regard to Cannaday's ability to use his hands for fine manipulation, i.e. to feel, handle and finger. However, the ALJ nevertheless concluded that Cannaday possessed the residual functional capacity to perform a wide range of unskilled sedentary work. According to Social Security Ruling 96-9p, "[m]ost unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity [and] good use of the hands and fingers for repetitive hand-finger actions." Social Security Ruling (SSR), 96-9, 1996 LEXIS 6, *22. Thus, the Social Security Administration has plainly stated that the use of one's hands and fingers is a critical element in the ability to perform most unskilled sedentary occupations. In the case at hand, the ALJ specifically found that Cannaday suffered from a severe impairment, namely diabetic neuropathy, a condition which causes significant nerve problems that often affects the hands and feet. Despite this finding, the ALJ's residual functional capacity determination failed to include any limitation regarding Cannaday's ability to use his hands.

This court recognizes that the ALJ properly discussed the findings of each

-46-

medical professional and adequately noted the weight given to findings within record. In addition, the court acknowledges the opinions of the state agency physicians, Dr. Surrusco and Dr. Johnson, who each concluded that Cannaday was unlimited in his ability to handle, finger and feel. (R. at 511, 521.) However, because the ALJ determined that diabetic neuropathy constituted a severe impairment, it seems logical that the residual functional capacity finding should have contained specific limitations to reflect the impact of the impairment. Thus, by failing to note *any* manipulative impairments as to Cannaday's ability to use his hands, the ALJ essentially made a residual functional capacity determination that was inconsistent with his own findings. Had the ALJ included additional limitations associated with diabetic neuropathy in his residual functional capacity finding, the vocational expert's testimony would have likely yielded different results. For example, if additional limitations had been placed on Cannaday's residual functional capacity, the number of unskilled sedentary jobs available within the regional and national economies may have been significantly reduced, or, depending on the limitation, completely eliminated. Therefore, because the ALJ did not include any limitations relating to Cannaday's diabetic neuropathy, which was well-documented throughout the record, the undersigned is of the opinion that the residual functional capacity finding was not supported by substantial evidence.

Next, Cannaday argues that the ALJ failed to establish that there is other work within the national economy that the claimant can perform. (R. at 15-16.) Specifically, Cannaday asserts that the transcript from the hearing was incomplete due to portions of the transcript being transcribed as inaudible. (R. at 16.) Cannaday argues that the transcript does not contain a hypothetical question that properly set

-47-

forth the residual functional capacity determination as found by the ALJ; thus, Cannaday contends that the record is devoid of substantial evidence to support the ALJ's finding that other jobs exist within the national economy that Cannaday could perform. (R. at 16.) Conversely, the Commissioner contends that Cannaday's argument as to this issue is without merit. (Defendant's Brief in Support of Defendant's Motion for Summary Judgment, ("Defendant's Brief"), at 14.) Specifically, the Commissioner claims that the audible portions show that the ALJ presented a hypothetical question to the vocational expert that fully encompassed the findings by Dr. Johnson, a state agency physician. (Defendant's Brief at 14.)

The testimony of a vocational expert constitutes substantial evidence for purposes of judicial review where his opinion is based upon a consideration of all the evidence of record and is in response to a proper hypothetical question which fairly sets out all of a claimant's impairments. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1998.) The determination of whether a hypothetical question fairly sets out all of a claimant's impairments turns on two issues: 1) whether the ALJ's finding as to the claimant's residual functional capacity is supported by substantial evidence; and 2) whether the hypothetical adequately set forth the residual functional capacity as found by the ALJ. The Commissioner may not rely upon the answer to a hypothetical question if the hypothesis fails to fit the facts. *See Swaim v. Califano*, 599 F.2d 1309, 1312 (4th Cir. 1979).

After reviewing the transcript from the December 15, 2005, ALJ hearing, it is obvious that portions of the testimony, as well as the questions posed by the ALJ, are missing and incomplete. Due to the inaudible portions of the hearing transcript, it

-48-

was very difficult for the undersigned to interpret and fully understand the exchanges between the ALJ and the claimant, but more importantly, the exchanges between the ALJ and the vocational expert. (R. at 317-20.) Furthermore, although the Commissioner argues that the relevant audible portions clearly indicate the basis of the ALJ's question, it should be pointed out that this alleged basis was inconsistent with the ALJ's residual functional capacity finding. At the hearing, the ALJ asked the vocational expert to consider Exhibit 9F, which was a PRFC completed by Dr. Johnson. (R. at 318.) After considering Dr. Johnson's report, the vocational expert opined that Cannaday could perform jobs as an office clerk and a surveillance monitor. (R. at 320.) However, this hypothetical failed to set forth the residual functional capacity as found by the ALJ. The ALJ's residual functional capacity included environmental limitations, and limited Cannaday's ability to work at unprotected heights and around moving machinery. (R. at 22.) Dr. Johnson's report did not include either limitation. (R. at 519-25.) In addition, Dr. Johnson noted that Cannaday could stand/walk for approximately four hours, (R. at 520), while the ALJ simply noted that Cannaday could stand/walk for at least two hours. (R. at 22.) Thus, had the ALJ posed a hypothetical that reflected his more restrictive findings, the vocational expert could have easily identified fewer available occupations, thereby altering her testimony. Accordingly, based upon a review of the audible portions of the transcript, this particular hypothetical did not adequately set forth a residual functional capacity consistent with the ALJ's findings; thus, the answer to the hypothetical may not be relied upon by the Commissioner. *See Swaim*, 599 F.2d at 1312.

The court recognizes that another hypothetical question also was posed to the

vocational expert. Therefore, it is possible that the other hypothetical question posed by the ALJ was intended to properly reflect his residual functional capacity. However, due to the inaudible portions of the transcript, it is difficult to precisely discern what the ALJ asked the vocational expert to consider. (R. at 317-18.) Thus, it is impossible to determine whether this particular hypothetical was properly presented to the vocational expert. As such, based upon the uncertainty created by the hearing transcript, not only is the court unable to examine the adequacy of the ALJ's hypothetical, but the undersigned also cannot find substantial evidence within the record to support the ALJ's finding that other jobs exist in the national economy that Cannaday can perform. *See Russell v. Sullivan*, 914 F.2d 1492 (4th Cir. 1990) (unpublished) (holding that substantial evidence does not exist when critical testimony is inaudible). The lack of clarity within the hearing transcript prevents this court from determining whether there is substantial evidence to support the ALJ's findings. Therefore, the case shall be remanded to the Commissioner for further consideration.

## *IV. Conclusion*

For the foregoing reasons, Cannaday's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be denied, the Commissioner's decision denying benefits will be vacated and the case will be remanded to the Commissioner for further consideration consistent with this Memorandum Opinion.

An appropriate order will be entered.

DATED:     This _5th_ day of June 2008.


_Glen M. Williams_
THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE